UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　　*Plaintiff,*<br><br>　　　　v.<br><br>BAKER HUGHES INCORPORATED<br>　　　　　　　　*and*<br><br>BJ SERVICES COMPANY,<br>　　　　　　　　*Defendant*s. | Civil Action No.: **1:10-cv-00659**<br><br>**Filed:**<br><br>**Judge: Honorable Gladys Kessler** |

## FINAL JUDGMENT

WHEREAS, Plaintiff United States of America ("United States") filed its Complaint on April 27, 2010, the United States and defendants Baker Hughes Incorporated and BJ Services Company, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures

required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I. **JURISDICTION**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. **DEFINITIONS**

As used in this Final Judgment:

A.     "Acquirer" means the entity to whom Defendants divest the Divestiture assets.

B.     "Baker Hughes" means defendant Baker Hughes Incorporated, a Delaware corporation headquartered in Houston, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.     "BJ" or "BJ Services" means defendant BJ Services Company, a Delaware corporation headquartered in Houston, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.      "Blue Ray" means the marine stimulation vessel named the Blue Ray currently

leased and operated by BJ in the Gulf, and any equipment installed on or used to operate the

Blue Ray as of March 1, 2010.

E.      "BrineStar Intangible Assets" means Patent Application Nos. 12/030,614 and

12/365,673 and associated Intangible Assets primarily used in connection with the design,

development, testing, production, quality control, marketing, servicing, sale, installation, or

distribution of BJ's BrineStar and BrineStar II products.

F.      "Diamond Fraq Intangible Assets" means Patent Nos. 7,052,901; 7,343,972;

7,595,284; 7,645,724; 7,655,603; 7,347,266; 7,615,517; 7,530,393; 7,550,413; 7,543,644;

7,544,643; 7,527,102; 7,527,103; and associated Intangible Assets primarily used in connection

with the design, development, testing, production, quality control, marketing, servicing, sale,

installation, or distribution of  Baker Hughes' Diamond Fraq products.

G.      "Divestiture Assets" means the real property and Tangible and Intangible  Assets

listed in Schedules A through C.  Divestiture Assets shall not be interpreted to include (a) any

equipment installed on stimulation vessels other than the Blue Ray or HR Hughes; (b) BJ

Services' ownership or leasehold interest in skids or non-vessel based pumping equipment; or (c)

the Tangible or Intangible Assets primarily used in connection with the design, development,

testing, production, quality control, marketing, servicing, sale, installation, or distribution of

Baker Hughes' Sand Control Tools or BJ Services' Stimulation Fluids other than (i) those BJ

Stimulation Fluids assets specifically set forth in Schedule C and (ii) any information, data, or

documents relating to any Divestiture Assets.

3

H.     "Gulf" means the United States Gulf of Mexico.

I.     "HR Hughes" means the marine stimulation vessel named the HR Hughes currently leased and operated by Baker Hughes in the Gulf, and any equipment installed on or used to operate the HR Hughes as of March 1, 2010.

J.     "Intangible Asset" means any asset other than a Tangible Asset, including, but not limited to:

> (1)    patents or patent applications, licenses and sublicenses, copyrights, trademarks, trade secrets, trade names, service marks, and service names, but excluding the following trade names: BJ, Baker Oil Tools, and Baker Hughes.

> (2)    know-how, including recipes, formulas, machine settings, drawings, blueprints, designs, design protocols, design tools, simulation capability, specifications for materials, specifications for parts and devices,

> (3)    computer software (*e.g.* vessel communication and remote monitoring software), databases (*e.g.* databases containing technical job histories) and related documentation;

> (4)    procedures and processes related to operations, quality assurance and control, and health, safety and environment;

> (5)    data concerning historic and current research and development, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

4

(6)     all contractual rights; and

(7)     all authorizations, permits, licenses, registrations, or other forms of

permission, consent, or authority issued, granted, or otherwise made

available by or under the authority of any governmental authority.

K.     "Latest Generation MST Intangible Assets" means Patent Nos. 7,490,669;

7,543,647; 6,397,949; 6,722,440; 7,124,824; 7,198,109; 7,201,232; 7,152,678; RE40648;

6,405,800; 7,021,389; 7,150,326; 7,497,265, and associated Intangible Assets primarily used in

connection with the design, development, testing, production, quality control, marketing,

servicing, sale, installation, or distribution of  BJ's Multi-Zone Single Trip Well Completion

System.

L.     "Relevant Employees" means the employees listed in Schedule D.

M.     "Sand Control Tools" means those tools used or installed in connection with the

performance of Stimulation Services at or below the zones in which hydrocarbons are located;

including but not limited to, the components of sump packer assemblies, frac pack assemblies,

and high rate water pack assemblies; screens; fluid loss valves; blank pipe; isolation tubing;

production seals; and service tools.

N.     "Stimulation Fluids" means acids, proppants, gels, or other fluids or additives

used to provide Stimulation Services.

O.     "Stimulation Services" means acidizing, gravel packs, frac packs, high rate water

packs, or hydraulic fracturing services performed from vessels or

skid-mounted pumping equipment.

5

P.      "Tangible Asset" means any physical asset (excluding real property or marine stimulation vessels not specifically identified as part of the Divestiture Assets), including, but not limited to:

(1)     all machinery, equipment, hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, laboratories, supplies, materials, vehicles, spare parts in respect of any of the foregoing and other tangible personal property;

(2)     improvements, fixed assets, and fixtures pertaining to the real property identified as part of the Divestiture Assets;

(3)     all inventories, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto; and

(4)     business records including financial records, accounting and credit records, tax records, governmental licenses and permits, bid records, customer lists, customer contracts, supplier contracts, service agreements; operations records including vessel logs, calendars, and schedules; job records, research and development records, health, environment and safety records, repair and performance records, training records, and all manuals and technical information Defendants provide to their own employees, customers, suppliers, agents or licensees.

Q.      "Transaction" means Baker Hughes' proposed merger with BJ Services, which was the subject of Hart-Scott-Rodino Report No. 2009-0748, filed with the Federal Trade

6

Commission and the U.S. Department of Justice on September 14, 2009.

## III.   APPLICABILITY

A.      This Final Judgment applies to Baker Hughes and BJ Services, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Section IV and VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the acquirer to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the Acquirer of the assets divested pursuant to this Final Judgment.

C.      Defendants shall require, as a condition of the sale of the Divestiture Assets, that the Acquirer agree to be bound by Section XI of this Final Judgment.

## IV.   DIVESTITURES

A.      Defendants are ordered and directed, within sixty (60) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances.  Defendants agree to divest the Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, Defendants

promptly shall make known widely the availability of the Divestiture Assets. Defendants shall

inform any person making inquiry regarding a possible purchase of the Divestiture Assets that

they are being divested pursuant to this Final Judgment and provide that person with a copy of

this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to

customary confidentiality assurances, all information and documents relating to the Divestiture

Assets customarily provided in a due diligence process, except such information or documents

subject to the attorney-client privilege or work-product doctrine. Defendants shall make

available such information to the United States at the same time that such information is made

available to any other person.

       C.     Defendants shall permit prospective Acquirers of the Divestiture Assets to have

reasonable access to personnel and to make inspections of the physical facilities associated with

the Divestiture Assets; access to any and all environmental, zoning, and other permit documents

and information; and access to any and all financial, operational, or other documents and

information customarily provided as part of a due diligence process.

       D.     Defendants shall warrant to the Acquirer that each asset will be operational on the

date of sale. Defendants shall maintain and enforce all intellectual property rights licensed to

the Acquirer pursuant to the proposed Final Judgment.

       E.     Defendants shall not take any action that will impede in any way the permitting,

operation, use, or divestiture of the Divestiture Assets.

       F.     Defendants shall warrant to the Acquirer that there are no material defects in the

environmental, zoning or other permits pertaining to the operation of each asset, and that

following the sale of the Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

G.      Defendants shall take all necessary steps to accomplish the transfer of all interests the Defendants have in the HR Hughes, the Blue Ray, and any other Divestiture Asset in which the Defendants have an ownership or leasehold interest, including, but not limited to, obtaining authorization from Edison Chouest Offshore and Hornbeck Offshore Services LLC to assign Defendants' leasehold interests in the HR Hughes and the Blue Ray, respectively.  Defendants agree to take all necessary steps, including paying all costs, to install the same communication, stimulation and instrumentation control software on the HR Hughes that is on the Blue Ray, or vice versa, at the preference of the Acquirer.  Defendants will provide to the Acquirer copies of all manuals and training materials relating to the communication, stimulation and instrumentation control software on the HR Hughes and the Blue Ray and rights to training or service under any agreements Defendants have with third parties.

H.      Except for assets discussed in IV G. above, Defendants shall use commercially reasonable efforts to obtain any necessary consent to assign contractual rights that are included in the Divestiture Assets, including, but not limited to, contractual rights to provide Stimulation Services, Sand Control Tools, or Stimulation Fluids for wells located in the Gulf, and contractual rights to purchase any inputs or components to those  Services, Tools, or Fluids.

I.      Where the Acquirer has the option to acquire specific facilities but chooses not to exercise that option:

9

(1)     Defendants shall bear the expense of relocating to the location of the Acquirer's choice Tangible Assets that are part of the Divestiture Assets from any of those facilities.

(2)     If the Acquirer chooses not to purchase the entire Completion Tool Technology Center of BJ (see Schedule B), Defendants shall, at the option of the Acquirer, make structural changes, at Defendants' expense, to Building E at the Completion Tool Technology Center, or to another location of the Acquirer's choosing, to enable the Acquirer to conduct testing of sand control tools. The structural changes will include the construction of up to two test cells that will be the equivalent in size, capabilities, technology, and rating of the test cells currently located at the Completion Tool Technology Center. Until the test cells are completed, and upon two business days notice, the purchaser will have the right to exclusive use, at no charge, of Building A at the Completion Tool Technology Center (in which test cells are currently located) for up to 14 days in any calendar month.

(3)     If the Acquirer chooses not to purchase BJ's Southpark facility in Lafayette, Louisiana, Defendants shall add to the Completion Tool Technology Center, or to another location of the Acquirer's choosing, a sand control laboratory equivalent to Defendant Baker Hughes' sand control laboratory at its Lafayette Supercenter.

J.      Unless the United States otherwise consents in writing, the divestiture pursuant to

Section IV, or by the trustee appointed pursuant to Section VI, of the Final Judgment, shall

include all of the Divestiture Assets, and the divestiture shall be accomplished in such a way as

to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used

by the Acquirer as part of a viable, ongoing business engaged in the design, development,

production, marketing, servicing, distribution, and sale of the Stimulation Services, Sand Control

Tools, and Stimulation Fluids for wells located in the Gulf, and that such divestiture will remedy

the competitive harm alleged in the Complaint.  The divestiture, whether pursuant to Section IV

or Section VI of this Final Judgment:

(1)     shall be made to an Acquirer that, in the United States' sole judgment, has

the intent and capability (including the necessary managerial, operational, technical and financial

capability) of competing effectively as a supplier of Stimulation Services, Sand Control Tools,

and Stimulation Fluids for customers in the Gulf; and

(2)     shall be accomplished so as to satisfy the United States, in its sole

discretion, that none of the terms of any agreement between the Acquirer and Defendants give

Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's

efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. **RIGHT TO HIRE**

A.      To enable the Acquirer to make offers of employment, Defendants shall provide

the Acquirer and the United States with organization charts and information relating to Relevant

Employees, including name, job title, responsibilities as of March 1, 2010, training and

educational history, relevant certifications, and, to the extent permissible by law, job performance evaluations, and current salary and benefits information.

B.      Upon request, Defendants shall make Relevant Employees available for interviews with the Acquirer during normal business hours at a mutually agreeable location and will not interfere with any negotiations by the Acquirer to employ Relevant Employees. Interference with respect to this paragraph includes, but is not limited to, offering to increase the salary or benefits of Relevant Employees other than as a part of a company-wide increase in salary or benefits granted in the ordinary course of business.

C.      For Relevant Employees who elect employment by the Acquirer, Defendants shall waive all noncompete agreements and all nondisclosure agreements, except as specified in V D. below, vest all unvested pension and other equity rights, and provide all benefits to which the Relevant Employees would generally be provided if transferred to a buyer of an ongoing business.

D.      Nothing in this Section shall prohibit Defendants from maintaining any reasonable restrictions on the disclosure by an employee who accepts an offer of employment with the Acquirer of the Defendants' proprietary non-public information that is (1) not otherwise required to be disclosed by this Final Judgment, (2) related solely to the Defendants' businesses and clients, and (3) unrelated to the Divestiture Assets.

## VI. **APPOINTMENT OF TRUSTEE**

A.      If Defendants have not divested the Divestiture Assets within the time period specified in Section IVA. of this Final Judgment, Defendants shall notify the United States of that fact in writing.  Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets.  The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate.  Subject to Section VI D. of this Final Judgment, the trustee may hire at the cost and expense of Defendants any investment bankers, attorneys, accountants or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

C.      Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VII.

D.      The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves.  The trustee shall account for all monies derived from

13

the sale of the assets sold by the trustee and all costs and expenses so incurred. After payment of fees for the trustee's services and those of investment bankers, attorneys, accountants or other agents retained by it, all remaining money shall be paid to Defendants. After the trustee submits its final report, including the final accounting, to the court, the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount. Defendants shall expeditiously reach agreement with the trustee on the trustee's fee arrangement.

E.       Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Divestiture Assets, and Defendants shall develop financial and other information relevant to the Divestiture Assets as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with, delay, or impede the trustee's accomplishment of the divestitures.

F.       After its appointment, the trustee shall file monthly reports with the United States setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring,

14

entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestitures ordered under this Final Judgment within six (6) months after his or her appointment, the trustee shall promptly file with the Court a report setting forth: (1) the trustee's efforts to accomplish the required divestitures; (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished; and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VII.  <u>NOTICE OF PROPOSED DIVESTITURE</u>

A.      Within two (2) business days following execution of a definitive divestiture agreement, Defendants shall notify the United States of any proposed divestiture required by Section IV of this Final Judgment. Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Defendants of any proposed divestiture required by Section VI of this Final Judgment. The notice provided to the United States shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer.  Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within forty-five (45) calendar days after receipt of the notice or within thirty (30) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture.  If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section VI C. of this Final Judgment.  Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section VI shall not be consummated.  Upon objection by Defendants under Section VI C., a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII. **FINANCING**

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or VI of this Final Judgment.

## IX.  HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court.  Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## X.  AFFIDAVITS

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or VI, Defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or VI of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitations on information, shall be made within fourteen

(14) calendar days of receipt of such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter,

Defendants shall deliver to the United States an affidavit that describes in reasonable detail all

actions Defendants have taken and all steps Defendants have implemented on an ongoing basis

to comply with Section IX of this Final Judgment.  Defendants shall deliver to the United States

an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier

affidavits filed pursuant to this Section within fifteen (15) calendar days after the change is

implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the

Divestiture Assets until one year after such divestiture has been completed.

## XI. <u>CONDITIONS PLACED UPON THE ACQUIRER</u>

A.      For five years from the entry of this Final Judgment, unless such transaction is

otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino

Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), the

Acquirer, without providing advance notification to the Antitrust Division, shall not directly or

indirectly sell any of the Divestiture Assets or any interest (including, but not limited to, any

financial, security, loan, equity, or management interest) in any of the Divestiture Assets to

Halliburton Company or Schlumberger Ltd.   Such notification shall be provided to the Antitrust

Division in the same format as, and per the instructions relating to the Notification and Report

Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as

amended.  Notification shall be provided at least thirty (30) calendar days prior to completion of

any such transaction, and shall include, beyond what may be required by the applicable

instructions, the names of the principal representatives of the parties to the agreement who

negotiated the agreement, and any management or strategic plans discussing the proposed

transaction.  If within the 30-day period after notification, representatives of the Antitrust

Division make a written request for additional information, the Acquirer shall not consummate

the proposed transaction or agreement until thirty (30) calendar days after submitting all such

additional information.  Early termination of the waiting periods in this paragraph may be

requested and, where appropriate, granted in the same manner as is applicable under the

requirements and provisions of the HSR Act and rules promulgated thereunder.  This Section

shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under

this Section shall be resolved in favor of filing notice.

      B.     The Acquirer shall not move the HR Hughes or the Blue Ray out of the Gulf for

two years from the entry of this Final Judgment without the prior written consent of the Antitrust

Division.

## XII. COMPLIANCE INSPECTION

      A.     For the purposes of determining or securing compliance with this Final Judgment,

or of determining whether the Final Judgment should be modified or vacated, and subject to any

legally recognized privilege, from time to time authorized representatives of the United States

Department of Justice Antitrust Division, including consultants and other persons retained by the

United States, shall, upon written request of an authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be

permitted:

   (1) access during Defendants' office hours to inspect and copy, or at the

option of the United States, to require Defendants to provide hard copy or electronic copies of,

all books, ledgers, accounts, records, data, and documents in the possession, custody, or control

of Defendants, relating to any matters contained in this Final Judgment; and

   (2) to interview, either informally or on the record, Defendants' officers,

employees, or agents, who may have their individual counsel present, regarding such matters.

The interviews shall be subject to the reasonable convenience of the interviewee and without

restraint or interference by Defendants.

   B. Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, Defendants shall submit written reports or responses

to written interrogatories, under oath if requested, relating to any of the matters contained in this

Final Judgment as may be requested.

   C. No information or documents obtained by the means provided in this Section

shall be divulged by the United States to any person other than an authorized representative of

the executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

   D. If, at the time information or documents are furnished by Defendants to the

United States, Defendants represent and identify in writing the material in any such information

or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the

Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XIII. <u>NO REACQUISITION</u>

Defendants may not reacquire an ownership interest in any part of the Divestiture Assets during the term of this Final Judgment.

### XIV. <u>RETENTION OF JURISDICTION</u>

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XV. <u>EXPIRATION OF FINAL JUDGMENT</u>

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

### XVI. <u>PUBLIC INTEREST DETERMINATION</u>

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and responses to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: *July 26, 2010*

                           Court approval subject to procedures
                           of Antitrust Procedures and Penalties
                           Act, 15 U.S.C. § 16

                           *G Gladys Kessler*

                           United States District Judge Gladys Kessler

**Schedule A**
**Stimulation Services**

BJ Services Assets

1.    BJ Tangible Assets and Real Property:

    a.    BJ's ownership and leasehold interest in the Blue Ray.

    b.    At the option of the Acquirer, BJ's ownership and leasehold interest in one or more of the following facilities:

        i.    BJ's Crowley facility at West Highway 90 and Roller Road in Crowley, Louisiana 70526.

        ii.    BJ's Sales Offices at 1515 Poydras Street, Suite 2000, New Orleans, Louisiana  70508;

        iii.    BJ's Sales Offices at 5005 Mitchelldale Street, Suite 250, Houston, Texas 77092.

    c.    All Tangible Assets owned, leased or licensed by BJ that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or provision of Stimulation Services for wells located in the Gulf.

2.    BJ Intangible Assets:

    a.    All Intangible Assets owned, leased or licensed by BJ that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or provision of Stimulation Services for wells located in the Gulf.

    b.    Exclusions:

        i.    Excluded from this Schedule A is BJ's proprietary communication, stimulation, or instrumentation control software used in connection with the operation of the Blue Ray, *provided* that, if the Acquirer elects pursuant to Section IV G. to have Defendants install the same communication, stimulation and instrumentation control software on the HR Hughes that is installed on the Blue Ray, Defendants shall provide to

Acquirer a non-exclusive right to such software, including,

(1)    a worldwide, royalty-free, non-exclusive, perpetual, transferable license to all patents, trademarks, trade secrets, and other Intangible Assets in which Defendants assert intellectual property rights; such license shall grant the Acquirer the right (a) to make, have made, use, sell or offer for sale, copy, create derivative works, modify, improve, display, perform, and enhance the licensed Intangible Assets; and (b) to own any Intangible Assets the Acquirer generates pursuant to this license; and (c) to have end-user customers of the Acquirer enjoy the benefit of the Intangible Assets provided by the Acquirer pursuant to this license; and

(2)    a right to obtain copies of, assignment of, or other effective transfer of all other Intangible Assets.

<u>Baker Hughes Assets</u>

1.    Baker Hughes Tangible Assets and Real Property:

a.    Baker Hughes' ownership and leasehold interest in the HR Hughes.

b.    Baker Hughes' ownership and leasehold interest in the marine vessel stimulation dock facility located at Port Fourchon, Louisiana.

c.    Baker Hughes' ownership and leasehold interest in any mooring buoy(s) located in or around Port Fourchon, Louisiana.

d.    At the option of the Acquirer, Baker Hughes' ownership and leasehold interest in skids and non-vessel based pumping equipment that are used to perform Stimulation Services in the Gulf.

e.    All Tangible Assets owned, leased or licensed by Baker Hughes that are used in connection with the assets, facilities and real property identified in 1(a) - 1(d).

2.    Baker Hughes Intangible Assets:

a.    All Intangible Assets owned, leased or licensed by Baker Hughes that are primarily used in connection with or necessary for the use of the assets, facilities and real property identified in 1(a) - 1(d).

24

b.      With respect to Intangible Assets that are not included in paragraph 2(a) but that are used in connection with the assets, facilities and real property identified in 1(a) - 1(d), Defendants shall provide to Acquirer a non-exclusive right to such Intangible Assets for the design, development, testing, production, quality control, marketing, servicing, sale, installation, and provision of Stimulation Services, including,

       i.      a worldwide, royalty-free, non-exclusive, perpetual, transferable license to all patents, trademarks, trade secrets, and other Intangible Assets in which Defendants assert intellectual property rights; such license shall grant the Acquirer the right  (a) to make, have made, use, sell or offer for sale, copy, create derivative works, modify, improve, display, perform, and enhance the licensed Intangible Assets; (b) to own any Intangible Assets the Acquirer generates pursuant to this license; and (c) to have end-user customers of the Acquirer enjoy the benefit of Stimulation Services provided by the Acquirer pursuant to this license, and;

      ii.      a right to obtain copies of, assignment of, or other effective transfer of all other Intangible Assets.

25

**Schedule B**
**Sand Control Tools**

BJ Services Assets

1.    BJ Tangible Assets and Real Property:

      a.    At the option of the Acquirer, BJ's ownership and leasehold interest in one of the following:

            i.    The entire Completion Tool Technology Center located at 16610 Aldine Westfield, Houston, Texas 77073;

            ii.    A portion of the Completion Tool Technology Center located at 16610 Aldine Westfield, Houston, Texas 77073 consisting of the real property associated with Buildings D and E; or

            iii.    A portion of the Completion Tool Technology Center located at 16610 Aldine Westfield, Houston, Texas 77073 consisting of the real property associated with Building E.

      b.    At the option of the Acquirer, BJ's ownership and leasehold interest in the Southpark facility located at 203 Commission Blvd., Lafayette, Louisiana 70508.

      c.    At the option of the Acquirer, all Tangible Assets owned, leased or licensed by BJ that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or distribution of Sand Control Tools for wells located in the Gulf, except that Defendants have the right to retain one-half of the inventory of each of BJ's MST-related service tools and parts, and one-half of the inventory of BJ's MST-related consummables, located in the Gulf as of March 1, 2010.

2.    BJ Intangible Assets:

      a.    All Intangible Assets owned, leased or licensed by BJ that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or distribution of Sand Control Tools for wells located in the Gulf.

      b.    Exclusions:

            i.    Excluded from this Schedule B are the Latest Generation MST Intangible

26

Assets, *provided* that Defendants shall provide to Acquirer a non-exclusive right to the Latest Generation MST Intangible Assets for the design, development, testing, production, quality control, marketing, servicing, sale, installation, and distribution of Sand Control Tools, including,

(1)    a worldwide, royalty-free, non-exclusive, perpetual, transferable license to all patents, trademarks, trade secrets, and other Intangible Assets in which Defendants assert intellectual property rights; such license shall grant the Acquirer the right (a) to make, have made, use, sell or offer for sale, copy, create derivative works, modify, improve, display, perform, and enhance the licensed Intangible Assets; (b) to own any Intangible Assets the Acquirer generates pursuant to this license; and (c) to have end-user customers of the Acquirer enjoy the benefit of Sand Control Tools provided by the Acquirer pursuant to this license; and

(2)    a right to obtain copies of, assignment of, or other effective transfer of all other Intangible Assets (*e.g.* data, drawings, and other materials in BJ's drawing vault and engineering design request files).

**Schedule C**
**Stimulation Fluids**

Baker Hughes Assets

1.     Baker Hughes Tangible Assets:

     a.     All Tangible Assets owned, leased or licensed by Baker Hughes that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or distribution of Stimulation Fluids for wells located in the Gulf.

2.     Baker Hughes Intangible Assets:

     a.     All Intangible Assets owned, leased or licensed by Baker Hughes that are primarily used in connection with or necessary for Baker Hughes' design, development, testing, production, quality control, marketing, servicing, sale, installation, or distribution of Stimulation Fluids for wells located in the Gulf, but not including the Diamond Fraq Intangible Assets.

     b.     With respect to Intangible Assets that are not included in paragraph 2(a) but that are used in connection with the design, development, testing, production, quality control, marketing, servicing, sale, installation, or distribution of Stimulation Fluids for wells located in the Gulf (including but not limited to the Diamond Fraq Intangible Assets), Defendants shall provide to Acquirer a non-exclusive right to such Intangible Assets for the design, development, testing, production, quality control, marketing, servicing, sale, installation, and distribution of Stimulation Fluids, including,

          i.     a worldwide, royalty-free, non-exclusive, perpetual, transferable license to all patents, trademarks, trade secrets, and other Intangible Assets in which Defendants assert intellectual property rights; such license shall grant the Acquirer the right  (a) to make, have made, use, sell or offer for sale, copy, create derivative works, modify, improve, display, perform, and enhance the licensed Intangible Assets; (b) to own any Intangible Assets the Acquirer generates pursuant to this license; and (c) to have end-user customers of the Acquirer enjoy the benefit of Stimulation Fluids provided by the Acquirer pursuant to this license, and;

          ii.     a right to obtain copies of, assignment of, or other effective transfer of all other Intangible Assets (*e.g* lab reports, lab notebooks, project books, mixing manuals, and technical papers).

<u>BJ Services Assets</u>

1.   BJ Tangible Assets:

    a.   At the option of the Acquirer, Defendant BJ's ownership and leasehold interest in any trucks and tanks used by BJ to transport Stimulation Fluids for sale, distribution or installation for wells located in the Gulf.

2.   BJ Intangible Assets:

    a.   With respect to the BrineStar Intangible Assets, Defendants shall convey to Acquirer a non-exclusive right to the BrineStar Intangible Assets for the design, development, testing, production, quality control, marketing, servicing, sale, installation, and distribution of Stimulation Fluids, including,

        i.   a worldwide, royalty-free, non-exclusive, perpetual, transferable license to all patents, trademarks, trade secrets, and other Intangible Assets in which Defendants assert intellectual property rights; such license shall grant the Acquirer the right  (a) to make, have made, use, sell or offer for sale, copy, create derivative works, modify, improve, display, perform, and enhance the licensed Intangible Assets; (b) to own any Intangible Assets the Acquirer generates pursuant to this license; and (c) to have end-user customers of the Acquirer enjoy the benefit of Stimulation Fluids provided by the Acquirer pursuant to this license, and;

        ii.   a right to obtain copies of, assignment of, or other effective transfer of all other Intangible Assets (*e.g.* data, files, and other materials in BJ's drawing vault and engineering design request files).

29

## Schedule D
## Relevant Employees

1.   Relevant Employees means:

   a.   All BJ employees whose job responsibilities as of March 1, 2010 included the design, development, testing, production, quality control, marketing, servicing, sale, and/or provision of Stimulation Services for wells in the Gulf; but not including the vessel-based crews of stimulation vessels other than the Blue Ray;

   b.   All Baker Hughes employees whose job responsibilities as of March 1, 2010 included the provision of Stimulation Services using the HR Hughes and/or skid-based equipment for wells located in the Gulf; including all vessel-based and skid-based crews and related land-based support personnel;

   c.   All BJ employees whose job responsibilities as of March 1, 2010 included the design, development, testing, production, quality control, marketing, servicing, sale, installation, and/or distribution of Sand Control Tools for wells located in the Gulf; and

   d.   All Baker Hughes employees whose job responsibilities as of March 1, 2010 included the design, development, testing, production, quality control, marketing, servicing, sale, installation, and/or distribution of Stimulation Fluids for wells located in the Gulf.

2.   Relevant Employees otherwise described in this Schedule D shall not include:

   a.   all Baker Hughes employees who, as of March 1, 2010, had a title of Vice President or higher;

   b.   a maximum of four BJ employees, to be selected by Defendants and identified to the United States and to the Acquirer, whose responsibilities are primarily related to the research and development of the Latest Generation MST Intangible Assets;

   c.   a maximum of one Baker Hughes employee, to be selected by Defendants and identified to the Untied States and to the Acquirer, whose responsibilities are primarily related to the research and development of Baker Hughes' Diamond Fraq Intangible Assets; and

   d.   the individual who on March 1, 2010 held the position at BJ of Gulf Coast Region Sales Manager.